Frederick G. **GRABB** and Thomas M. Julow, Plaintiffs,

v.

The **BENDIX CORPORATION, Defendant.**

No. S 82–470.

United States District Court, N.D. Indiana, South Bend Division.

July 22, 1986.

Thomas J. Brunner, Jr., South Bend, Ind., for plaintiffs.

Robert Michaud, Arthur A. May, James W. Oberfell, South Bend, Ind., Lawrence C. DiNardo, Thomas J. Piskorski, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The plaintiffs, Frederick G. Grabb and Thomas M. Julow, filed this case alleging that they were separated from employment with the defendant, The Bendix Corporation (Bendix) because of their age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a) (ADEA) and further alleged that after their separation, they were not offered employment in other divisions of Bendix because of their age. Extensive discovery has been conducted in this case including the taking of the depositions of the principal people at Bendix re-

sponsible for the employment decision in this case and this case had been set on this court's trial calendar. Bendix has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. All parties have fully briefed the issues and oral argument was heard on May 27, 1986. At that hearing, the parties were given until June 16, 1986 to file any outstanding depositions and any supplemental material with respect to the motion for summary judgment.

This court has carefully read and reviewed all of the depositions filed in this case which includes the depositions of Thomas Miner Julow, John P. Makielski, James Richard Wallace, Edgar Anthony Behrmann, Roger William Miller, Louis S. Tang, William T. Birge, Kathleen B. Hayward, Dennis Hayward, Hugo Novais De Campos, Larry A. Portolese, John Edmund Mackiewicz, David James Lawrence, Wayne Paul Vance, George William Knox (2 volumes), Delbert James Gardner (2 volumes), Frederick George Grabb, George Paul McCabe, Jr., Thomas Robert O'Reilly, Robert Thomas DuCharme, Edward Lynn Akins, Larry Henry, Charlene Theresa Plasschaert, Russell Neal Ether, Richard Lewis Morrison, Jean H. Rideout, Howard Laurence McClelland (2 volumes), Thomas C. Schaefer, Robert H. Michaud, and Paul Meier. This court has also carefully reviewed all of the answers to interrogatories, documents produced in response to requests for production of documents, requests for admissions and affidavits filed in this case.

 Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment must be entered if the pleadings, depositions, answers to interrogatories, admissions and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R. Civ.Proc. 56(e). The court must view the record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *See, e.g., Box v. A & P Tea Co.,* 772 F.2d 1372, 1375 (7th Cir.1985); *Munson v. Friske,* 754 F.2d 683,

690 (7th Cir.1985); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983). However, when a motion for summary judgment is properly made and supported, an adverse party may not rest on mere allegations or denials in his pleadings nor is a bare contention that an issue of fact exists sufficient to raise a factual issue. *Posey v. Skyline, supra* at 105; *Shacket v. Philko Aviation, Inc.,* 681 F.2d 506, 513 n. 8 (7th Cir.1982). The adverse party must set forth specific facts showing a genuine issue for trial. *Posey v. Skyline, supra* at 105. Further, as a general principle, questions of motive and intent are inappropriate for summary judgment, *Box v. A & P Tea Co., supra* at 1378; *see Cedillo v. International Ass'n of Bridge & Structural Iron Workers,* 603 F.2d 7, 11 (7th Cir.1979), so summary judgment in discrimination cases must be approached with great caution. *Huhn v. Koehring Co.,* 718 F.2d 239, 243 (7th Cir.1983).

Most recently, the Supreme Court of the United States, in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) held that Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses tried to a jury but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the rule, prior to trial, that such claims and defenses have no factual basis. In reaching this result Justice Rehnquist speaking for the Court said:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof. [T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, —— (1986), 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202.

The majority opinion went on to emphasize that Rule 56 does not place upon a moving party the duty of negating an opponent's claim.

## I.

Mr. Grabb, a mechanical engineer by education, was hired by Bendix in 1951 right out of college to work in its Missile Systems Division. After working in that Division for about 17 years, Mr. Grabb was transferred to the Anti-Skid Group in 1968 which was a part of the Automotive Control Systems Group (ACSG), Department 856. In 1975, Mr. Grabb was promoted to Project Engineer in the Brake Control Systems portion of ACSG–Engineering, also in Department 856. In that position, Mr. Grabb was involved in advanced design and his responsibilities included supervising a group of 3 to 6 persons, inventing and developing new products in the "advanced booster" and vacuum pump area and serving as analytical consultant to other groups in Department 856 of ACSG–Engineering on all products. His responsibilities in that job also included assisting with program planning, organization, delegation and follow up with respect to the project involved. In March 1978, Mr. Grabb was transferred from Project Engineer to Staff Engineer in the Light Brake Division of ACSG–Engineering, Department 853. His work in that area involved design and development of an integral suspension system and he was the Suspension Component Program Coordinator which required that he make sure that key dates were met on time, coordinate processing and manufacturing/engineering activities, develop prototypes, do material selection, develop specifications, and do stress analysis. Six months later or approximately September 1978, Mr. Grabb was demoted to Senior Engineer because he received a low performance evaluation due to his failure to meet timing requirements for a project being done for Ford Motor Company and was transferred back to Department 856 of ACSG–Engineering. His work as a Senior Engineer primarily involved work on a new vacuum pump for use on passenger cars and trucks. After the demotion, Bendix instituted monthly reviews of Mr. Grabb in order to put together a program to try and match what Mr. Grabb could do well with the work that needed to be done and assist Mr. Grabb in areas in which he needed improvement as well as look at the progress being made by Mr. Grabb with respect thereto. Mr. Grabb's performance improved within the context of the work assignment given him and he was promoted back to Staff Engineer in May or June 1980 as he requested by Mr. Delbert Gardner, his supervisor. Mr. Grabb received a pay increase at the time of his last promotion of about 10½ percent. He continued to work on the vacuum pump program after his promotion. Mr. Gardner did not know about the upcoming reduction in force at the time of Mr. Grabb's promotion to Staff Engineer.

The performance evaluations with respect to Mr. Grabb reveal that he consistently was high in some areas and consistently low in others. Mr. Grabb's strong points were his high degree of knowledge, proficiency and engineering skill, his creativity and that he had an organized and analytical mind. His weak points were work/project planning, organizing/managing projects, delegation and follow up of work, not working well toward meeting deadlines, scheduling and not being result oriented. In May 1980, Mr. Grabb's performance evaluation revealed that he wanted more responsibility and wanted to be promoted to Staff Engineer. He received a 3+ performance evaluation in May 1980. The evaluations further revealed that Mr. Grabb could not work well in a "stress" environment because of his past history of ulcers and that he approached his job functions/working environment in such a way as to avoid a situation that would reactivate his ulcer problems although the ulcer

problem itself did not interfere with his work. Mr. Robert DuCharme, the director or manager of the division of ACSG–Engineering in which Mr. Grabb worked, gave the same evaluation of Mr. Grabb as was revealed in the written performance evaluations done by Mr. Grabb's immediate supervisors.

Mr. Julow, the other plaintiff in this case, was also hired by Bendix in 1951. He received his bachelors degree in electrical engineering at Purdue University and started with Bendix as a Junior Engineer doing laboratory testing in the Brake Control Systems Division of ACSG–Engineering, Department 856. In 1975, Mr. Julow was promoted to Project Engineer and his responsibility was primarily liaison between his department and other departments within the corporation and with outside vendors and customers. In that capacity, he had responsibility for overseeing the contact between engineering and purchasing, quality control, manufacturing, outside vendors and sometimes customers. This included acting as watchdog over manufacturing and quality control with respect to Master Vac, Hydrovac and Convac projects, provide comments on new or proposed manufacturing methods or practices, monitor ongoing methods and practices, communicating items that needed attention to the appropriate persons, and initiating action to make improvements. This work included liaison between the Brake & Steering Division of ACSG–Engineering and Bendix Automotive of Canada, Windsor, Ontario (BAC). This BAC operation was closed due to a decline in business and Convac production was moved to a South American operation in 1979. In April 1980, Mr. Julow was assigned to a position of Staff Engineer because of his communication problems and Bendix wanted him to report to someone else. Mr. Julow was in the same department since joining Bendix in 1951.

Mr. Julow's performance evaluations reveal that he received a 2 rating in 1975. In 1978, after a job change that resulted in him better understanding what he was supposed to do, Mr. Julow received a 3 rating. Mr. Julow also received a 3 rating in 1979 and 1980. The performance evaluation of Mr. Julow in 1980 indicated his strengths were in product knowledge, manufacturing and processing expertise, familiarity with vendors and vendor processes, and familiarity with Bendix's internal procedures. That evaluation also noted that he was very strong in problem recognition and handling day to day manufacturing problems. Areas needing improvement were organization and written communications. The problem with communication was his noted weakness consistently and he found formalizing and documenting communications difficult. In terms of promotion, it was noted that Mr. Julow was very strong technically and highly product oriented and could do well if a higher level job was strictly product related.

In 1980, Bendix was a large corporation with several different divisions, including but not limited to, an Energy Controls Division (EC), Missile Systems Division, Aircraft Brake & Strut Division, Chassis & Brake Components Division, Friction Materials Division, ACSG and a Hydraulics Division. The Chassis & Brake Division was located in St. Joseph, Michigan, the Friction Materials Division was in Troy, New York and the remaining divisions mentioned above were in the South Bend, Indiana area. Bendix underwent a massive reorganization company wide in late 1980 and was acquired by Allied sometime thereafter.

The ACSG Division was involved in research, development, design, and manufacturing of products used by the automotive industry. ACSG was comprised of five divisions: Management Staff, Brake & Steering (Manufacturing), Engineering, Industrial Relations and Marketing. Within the Engineering Division of ACSG, there were four directorates: Engineering Technical Services; Brakes, Steering & Suspension; Brake Control Systems; and New Products. Further, within the four directorates, there were several departments.

The actual work performed in the individual departments varied according to the type of projects being pursued and the responsibilities of the various departments with respect to the projects. Some work

involved research and design for new products, redesign of existing products, new uses for various products, getting an item from design into production, working with customers to correct problems in design or manufacture of products, testing and quality control. Further, within the same department the projects being worked on may vary. Some projects were developing and doing research for future products and some projects were in conjunction with a certain customer for a certain product pursuant to specific plans or programs.

Within the engineering department of ACSG, there were different classifications of engineers with different grades associated therewith. Those classifications began with Junior or Associate Engineer and ended with Director. The first classification, Junior or Associate Engineer is at grade 20. There is an automatic grade and title change to Engineer, grade 22, which occurs after 6 months of satisfactory performance. This is the only automatic change or promotion. The next promotion is from Engineer to Senior Engineer which is grade 26. This is not an automatic promotion but usually occurs after 3 to 5 years experience with satisfactory performance and clear evidence of personal and technical growth. Beyond the Senior Engineer level, further promotions are made depending on performance and capability of the individual and time in grade is not a consideration.

There are two basic paths that engineers take at Bendix which is referred to as the "dual path" or "dual ladder". Under this system, the interest and capabilities of the individual are assessed in determining which path will be followed. For those engineers capable of and interested in management and supervision, the progression is from Project Engineer (grade 29) to Senior Project Engineer (grade 32), Manager (grade 35), Director (grade 42) and beyond up the management ladder at Bendix. For those that don't have an interest in or capability for supervision, the other path, the technical side, is appropriate. That progression is from Senior Engineer to Staff Engineer (grade 29), Senior Staff Engineer (grade 32), to Principal Engineer (grade 35). On the technical side of the

ladder, if an engineer earns promotions, he will have the potential of salary grades up to the equivalent of the department manager level on the supervisory ladder. Promotions are based on performance and capabilities as determined by the individual's superiors. This program recognizes the importance of the different qualities inherent in the two paths to the success of Bendix. There is a salary range within each grade and there may be some overlap of salary between grades.

Bendix also has a High Potential Program that was implemented in 1967. This program recognizes individuals with high potential early in their careers. There are very few individuals in this program and those individuals do not know that they are in the program, only their supervisors know. Once an individual is recognized as having high potential, there is a special emphasis on making sure that that individual gets the proper job mix for personal development and experience to enhance and accelerate his upward movement in the corporation.

ACSG has a performance review system which is outlined in a written document entitled "Salaried Employees Performance Review System." Written evaluations are prepared and performance planning and review interviews are scheduled 3 months after the date of hire and annually thereafter. This schedule for performance evaluations may be varied in some circumstances such as in the event of promotion, transfer, reclassification or demotion. The purposes of the performance evaluations are to: clarify duties and responsibilities, establish performance goals, identify and plan career growth activity, inform employees of supervisor's evaluation of past performance and goal accomplishments and provide an opportunity to clarify performance difficulties, career aspirations, and suggestions for work goals for the coming period as well as aid in the administration of salary and promotion decisions. An individual's performance is evaluated in three areas: (1) major duties and responsibilities as identified and written for each position; (2) performance factors which include

knowledge and proficiency planning, organizing work, control skills, communication skills, problem solving, adaptability, initiative, reliability, supervisory skills, performance appraisal skills, affirmative action and health and safety concerns if applicable; and (3) goal accomplishment—performance goals, project goals, and self development goals. Percentages of goal completion (from 0% to 100%) are assigned to the third area and rating points are assigned in the first two areas for each factor. The rating points range from 1 to 5 as follows: 1–Outstanding, 2–Exceeds Requirements, 3–Meets Requirements, 4–Below Requirements and 5–Unsatisfactory. A composite rating is then given for areas 1 and 2 outlined above. Upon completion of the performance evaluation by an employee's supervisor, that performance evaluation is reviewed with the employee and the employee may respond thereto in writing if he so desires.

The automobile industry has had a problem with a five year hire and layoff cycle that has impacted on suppliers to the automobile industry as well. In the early 1970's, there was a severe downturn in the automobile industry which resulted in a severe downturn in business for Bendix. Consequently, Bendix had a large reduction in force across the board from production to management. For example, in the Mishawaka plant of Bendix, there was a reduction from 2,000 employees to 300 employees. With the reduction, Bendix kept the more senior, well-rounded, experienced people and laid off the younger engineers. Accordingly, the bell curve for engineering manpower weighted toward the mature end. Further, Bendix did not have a program for hiring new engineers regardless of business conditions like Ford, IBM and Xerox had so the hire/layoff cycle left Bendix without engineers with middle level experience.

When the new management team came in at corporate headquarters in Southfield, Michigan with respect to Bendix's automotive section, they along with Mr. Birge, the then Director of Engineering for ACSG, recognized a need to do something about the situation referred to in the depositions as the "mature work force problem." Mr. Birge was particularly concerned that there would be no engineering department at ACSG in 3 to 5 years because of the pension program at Bendix, early retirement plus the competitive nature of the market that emerged in the mid–1970s when the marketplace for the automotive industry turned very good all of a sudden and Bendix began losing some of its key people. Accordingly, Bendix started recruiting heavily at college campuses which resulted in the Engineering staff being comprised of young engineers and older engineers but few in between.

In late 1979 and 1980, there was another severe decline in the automotive industry which necessitated a reduction in operations at ACSG. There were five reductions in force (rif) during this period of time: August 1979, January 1980, March or April 1980, June 1980 and September 1980. Those rifs impacted primarily on three of the five divisions of ACSG. Management Staff was not affected at all and the Industrial Relations Division only lost 3 employees. Further, the rifs did not affect any co-op employees. Co-op employees are students that are still in school with a five year program which permits engineering students to get work experience during the time they are attending school. The Engineering Division of ACSG was first impacted in the second rif although the most severe rif was the fifth one which occurred in September 1980 and was the one in which the plaintiffs in this case were separated from employment with Bendix.

At the time the plans for the September 1980 rifs were being made, Bendix's policy with respect to rifs was in a transition period. Bendix had Policy 1200 that dealt with rifs but there was not enough emphasis on business needs under the Policy. In May or June 1980, Mr. George Knox, Group Director of Employee Relations for ACSG received a new proposal, Policy 1202, from Dennis Hayward, Vice President of Human Resources for the automotive sector for Bendix. There were no substantial differences between proposed Policy 1202 and Policy 1200. Proposed Policy 1202 was

the policy that ACSG tried to follow with respect to the September 1980 rif. Proposed Policy 1202 was subsequently adopted by Bendix after the rif and was made retroactive to August 1, 1980. Policy 1202 has since been superseded.

Policy 1202 basically outlined the procedures to be followed in a rif situation with respect to the selection and approval of employees that would be affected by a rif as well as the administration of the rif itself. Bendix ACSG attempted to follow the procedures set forth in Policy 1202 as closely as possible with respect to the September 1980 rif although, because of timing and other considerations, the steps taken by ACSG were not necessarily done in the chronological order suggested in the policy. The fiscal year for Bendix ends on September 30th so the rif had to be completed by then. Accordingly, the procedure had to be expedited and some of the steps were done concurrently instead of chronologically but the Bendix personnel involved in the decision making and implementation of the rif tried to follow the policy at all times and accomplish the task in the fairest manner possible. Policy 1202 contained, in part, the following provisions:

## C. RIF SELECTION AND APPROVAL

It is important that the determination of the necessity for a RIF be made as far in advance of an actual termination of employment as possible, in order to provide for the least disruptive implementation of these procedures.

1. When a proposed RIF would result in 5 or more salaried employees leaving the company, the Director of Employee Relations (DER) of the location shall notify the group DER and shall consult with the Corporate Director of Human Resources. This consultation should be at the initial stage of the development of the RIF Plan, to ensure the following:

a) the Plan minimizes the impact on employees with records of high performance or unique job qualifications;

b) placement activities inside and outside of Bendix are vigorously pursued;

c) the Plan does not have adverse impact on EEO goals, age and skill distribution of the workforce and similar corporate objectives;

2. The DER shall work with appropriate operating personnel in the selection of RIF candidates and shall be responsible for approving all RIF recommendations before submission to the Separation Committee. The following guidelines should govern such recommendations:

a) the need to retain employees with unique job qualifications, higher performance or significant capability to contribute to the overall business objectives. If these factors are equal, employees with the least service should be laid off first;

b) the impact which projected terminations would have on corporate goals or programs such as EEO and workforce age and skill distribution.

Temporary and part-time employees should generally be terminated first, especially if they have similar skills and work in the same departments as permanent, full-time personnel who are terminated. Exceptions may be warranted based on the factors identified in 2a) and b) above.

Other exceptions may be considered for co-op students or situations in which the work to be performed requires only part time rather than full time personnel.

3. The DER shall present the recommended RIF candidates to the Separation Committee for approval. This Committee shall consist of the General Manager or senior group executive, DER, assigned counsel and at least two other major department heads.

The following supporting material which will constitute the R.I.F. Plan shall accompany the R.I.F. recommendations:

a) a RIF Request Form (Document A), or other form providing substantially similar material, for every proposed RIF candidate;

b) Performance material if it is a factor in the selection of the RIF candidate. This material should include a current performance appraisal, or some recent

documentation of the supervisor's performance evaluation if a formal appraisal is not available. If there has been a change in performance over time, a summary of previous performance should also be provided;

c) a workforce impact summary as described in C 1c);

d) documentation that placement opportunities within the division/group have been explored.

4. When the Separation Committee approves the RIF Plan, the DER shall forward it to the Group D.E.R. for senior operating executive approval.

5. The senior operating executive shall review the Plan's adherence to the criteria outlined above. Upon his approval of the proposed actions, he shall forward the following information to the Corporate Director of Human Resources: a) Employees with 65 or more points; and b) Employees within 12 months of vesting or early retirement eligibility.

This shall be done at least 15 working days prior to the scheduled RIF. The DER will be notified when the Vice President, Corporate Organization and Human Resources approves this portion of the RIF Plan.

(NOTE: Employees within 12 months of vesting or early retirement eligibility, as governed by the applicable pension plan, *will* be granted an unpaid, personal leave of absence in order to fulfill service requirements for vesting.)

## D. ADMINISTRATION

1. Employee Relations staff groups must be sensitive to the personal and professional difficulties faced by individuals selected for RIF. Sufficient time and effort must be devoted to the following:

a) the manner and timing of employee RIF notification;

b) outplacement counseling and assistance;

c) communicating status of benefit programs. The attached guidelines may be used for this purpose.

2. The DER shall administer this policy in accordance with the following provisions:

a) salaried employees placed on a reduction in force should be given notice as much in advance of their departure from the payroll as possible *(normally 30 days, but in no case less than 2 weeks). Payment in lieu of notice is permissable.* To ensure continuity of pay the effective date of separation should be the last day of the month. Salaried employees shall not be given notification or be separated as a result of a RIF between December 1 and January 15;

b) an employee should not be informed that he/she is a candidate for RIF prior to the division receiving Corporate approval, if required. The only exception to this shall occur if placement efforts require the forwarding of specific materials to other divisions which have expressed an interest in employing the individual. Under such circumstances, the employee should be advised that he/she may be affected by a RIF, and interviews should be scheduled as appropriate;

c) notification should be provided by the immediate supervisor through personal contact and consultation with each employee. A member of the Employee Relations staff should provide any necessary assistance;

d) the DER shall designate a staff person to provide individual attention to employees selected for RIF and to coordinate the following potential outplacement activities:

1) assistance in resume preparation

2) counseling in interview techniques

3) circulation of resumes to other employers and agencies

4) placement of "personnel available" ads in newspapers

5) provisions for in-plant interview facilities for outside employers

6) employee time off for interviews

7) other activities considered appropriate

e) whenever possible, the scope of responsibilities of a new Bendix assign-

ment should be comparable to those of the employee's previous position. If an employee refuses a comparable position without sufficient reasons, such as relocation difficulties, the employee should be separated as a quit, rather than as a RIF;

f) if an employee is placed in a lower Bendix position, appropriate salary action shall be taken so that his/her salary is no more than 110% of the maximum of that grade;

g) if an employee is placed in another Bendix division, the receiving division pays the relocation cost;

h) separation payments for employees at divisions adopting this policy shall be paid in accordance with Employee Relations Policy Number 1205.

Further, if an employee that was to be separated from employment because of a reduction in force had 80 or more points based on age plus years of service, that employee could elect early retirement and receive pension benefits as entitled.

Mr. Thomas Schaefer, Vice President of ACSG–Engineering in 1980 first became aware of the need for the September rif in May or June 1980 when Mike Leonard, his immediate supervisor, told him that Bendix Management was requiring the ACSG–Engineering Department to reduce its budget by approximately three million dollars ($3,000,000.00) due to the declining business climate, i.e., the severe downturn in the automotive industry resulting in dramatically decreased business for ACSG. Mr. Schaefer then asked the directors of the four engineering divisions for preliminary information on how to meet the reduction. He gave the directors ball park figures proportional to the size of their budgets so collectively they would come up with a little in excess of the 3 million dollar reduction amount. In giving the directors the ball park figures, the number of employees that had to be reduced was determined by taking the average cost of an employee and dividing it into the total required reduction. Although the salary of the various positions in ACSG varied, an average salary plus costs was used to de-

termine the number of persons who had to be let go to meet the budget reduction. Accordingly, the directors were to identify what programs and/or departments could be eliminated or discontinued and what impact such cuts would have on ACSG's business. In this step, Mr. Schaefer was trying to scope out the magnitude of what ACSG was encountering by the cut. Mr. Schaefer also instructed the directors not to replace any employees that quit or were transferred and these employees were included in the number to reach the projected reduction in budget. Three engineers, all under 40 years of age, were transferred about this time and included in the budget reduction calculations. George Pope, a Manager Engineer, was transferred to the Friction Materials Division. James Putt, a Supervisory Engineer, was transferred to the Brake & Steering Division. Both of these individuals' names had appeared as candidates for the September rif. David Krebs, a Project Engineer, was transferred to the Bendix International Division of DBA–France. Mr. Krebs spoke French and had wanted an exchange position for several years. Mr. Schaefer made arrangements for Mr. Krebs since his language ability, skills and talents matched an opening in France. Informal efforts were made for placement of all engineers at the Missile Division and if other Bendix divisions had openings with certain requirements, that description might translate to a certain individual within ACSG. However, there first had to be a legitimate opening and no one was singled out for special treatment except Mr. Krebs because of his language ability and desire to be in France.

Mr. Schaefer had a list of all the employees in the organization by directorate/division, by grade or classification or title, latest performance review, length of service, age and combination of age and service points. Mr. Schaefer plotted the age distribution and skill distribution by classification or title pre-rif.

The directors reported back to Mr. Schaefer in about two weeks with a preliminary list of programs and departments to be cut. The projects cut were primarily those in

the early stages of development, i.e., for the future, whereas the projects for customers near completion or in production were not cut because of their relative impact on ACSG operations.

At that point in time, the work which would continue to be performed in the scaled down operations was specifically identified and a new organizational structure was developed for the reduced operation. Mr. Schaefer, together with Mr. Gardner and Mr. McClelland, the two remaining Directors in ACSG, then went through the list of employees and built the new organization with the best available people within the limit of the total number of people permitted by the budget. The organizational structure was filled from the top down, i.e. Director down to Secretary. A major criteria in determining who should fill a particular slot in the organization was a particular individual's ability to do the specific job. These ability assessments were based on the combined knowledge of Mr. Schaefer, Mr. Gardner and Mr. McClelland and were considered a unique job qualification. In making the assessment of ability, they looked at the individual's educational background as well as the individual's product familiarity. For example, if a position required an individual with product knowledge of axles, the group would look at the list to find the engineer with the best background in axles to fill the position. No distinction was made between Staff and Project Engineers in their selection process. Mr. Schaefer basically relied on what the supervisors said with respect to critical skills and day to day ability of the individual involved. The employees in the High Potential program were also considered, as well as an employee's significant capability to contribute to the overall business objectives of Bendix in the future. Once the engineering slots were filled in the new organizational structure, the group then filled in the staff positions in a particular area. Mr. Schaefer, Mr. Gardner and Mr. McClelland only considered performance evaluations and years of service when all other criteria were equal among possible candidates. They did not consider any EEO requirement in making their decisions

on the reorganization. Once the organizational chart was filled in, the remaining employees were the ones who would be affected by the rif. There were layoffs in all job categories and Bendix kept what it believed to be the most qualified people needed to perform the work remaining in the reorganized engineering division as ACSG.

The recommendations of Mr. Schaefer, Mr. Gardner and Mr. McClelland were then reviewed by the Rif Review Committee/Separation Committee which consisted of Mr. Schaefer, Mr. Delbert Gardner (Director of Engineering Production), L. McClelland (Director of Product Engineering), George Knox (ACSG Director of Employee Relations) and R. Michaud (Automotive Group Operation Counsel). This committee considered qualifications including educational background, product knowledge, flexibility, capability, performance, versatility, potential, and length of service and finalized the list of individuals that would be affected by the rif. Mr. Michaud and Mr. Knox asked questions about certain selections as needed to satisfy themselves that Policy 1202 had been complied with and that the rif selection process was accomplished in the fairest manner possible but did not challenge the organizational structure itself. Mr. Knox had not reviewed the rif recommendations before they went to the Rif/Separation Committee. The Rif/Separation Committee did not see any impact statements when it made its decision.

A document entitled "Reduction-In-Force Request Form" was filled out for each employee that would be affected by the September 1980 rif. These forms were filled out in part by Mr. Gardner and Mr. McClelland with respect to the abilities portion of the form. The Rif Request form contained information about the employee including personal background, position duties and responsibilities, reason for selection and recommendations. Under the position and duties section, the position title of the employee was identified, his assignments and previous Bendix positions were described along with his strongest abilities

and limitations and the necessity for reduction of personnel was explained. Under the recommendations section, the proposed date of separation was identified as well as an indication of whether the employee's qualifications and performance were sufficiently high to be considered for transfer to another department or division at Bendix. The only reason an employee would not be eligible for transfer within Bendix would be for disciplinary reasons or something similar to that. Further, if the form indicated that the employee was eligible for transfer, another form entitled "Available Managerial and Professional Personnel Form" was to be attached. This form is also referred to as the "Bendix Resume Form" and contained information about the employee including personal data, education, Bendix experience, other significant experience, other data (awards, patents, etc.) and information on who to contact for further information. This form was filled out by the personnel department before the rif and the information was based on the employee's record. This form as then sent to corporate headquarters in Southfield, Michigan. Usually, this form was then sent out to the other Bendix divisions in an effort to find alternative employment for those individuals to be affected by a rif to decrease the impact caused thereby by finding alternative employment before they were actually laid off.

Impact statements with respect to age, minorities and females were prepared with respect to the September rif as required by Policy 1202. The age distribution of employees at ACSG was also reviewed for before and after the rif. Before the rif, the average age of employees was 43 years and the median age was 44 years. After the rif, the average age was 44 and the median age was 46 years.

Upon completion of the rif plan by the people responsible in South Bend, the rif plan was reviewed by Dennis Hayward and Kathleen Brown Hayward. Mr. Hayward was Vice President of Human Resources for the automotive sector of Bendix and was stationed in Southfield, Michigan. In that position, Mr. Hayward had overview responsibility from the automotive stand-point for reductions in force and compliance with Bendix policy for reductions in force. Ms. Brown Hayward, as manager or director of Human Relations for the automotive group, was also involved in rifs and plant closings in the automotive sector. She managed some of the details and paper work associated with those efforts. Ms. Brown Hayward was also involved in general human resource planning for the autTo-motive group and to some extent with EEO compliance. She was involved in the plant closing of Bendix Automotive of Canada and also at the Heavy Vehicle Systems Group in Elyria, Ohio and the Friction Material Division in Troy, New York. She had reviewed the rif plans for those divisions.

Mr. Hayward was notified of the planned rif at South Bend and a date was established to go to South Bend to review the rif planning being put together there as required by Policy 1202. The trip to South Bend, which occurred in early September, was the first substantive activity Mr. Hayward had with respect to the September rif in South Bend. While in South Bend, Mr. Hayward and Ms. Brown Hayward reviewed the rif request forms for each person that was to be affected by the rif and also reviewed some performance material related to some of those employees. At that time, they also reviewed the work force impact statements and placements opportunities.

Mr. Hayward and Ms. Brown Hayward first talked to George Knox who presented them with the rif request forms and other material relative to the reduction. After an initial review, they talked to Tom Schaefer and reviewed what ACSG–Engineering was trying to accomplish and what skills were necessary to the operation given the reduction. Each individual's rif request form was then reviewed and they asked questions of Mr. Schaefer if necessary. After the review with Mr. Schaefer, they then reviewed the reductions with each department head with respect to his particular section or division. After finishing the review, they determined that the plan was consistent with Bendix policy on rifs and returned to Southfield.

After returning to Southfield, Mr. Hayward gave Mr. Birge, the Corporate Director of EEO the information on the impact of the rif with respect to age, minorities and females. Ms. Brown Hayward did statistical comparisons or impact analysis and found no adverse or disparate impact on age distribution as a result of the rif. This analysis was done for ACSG as an entity and not by classification. Information with respect to age plus service for purposes of early retirement and those individuals within one year of pension vesting was also provided. After review by the proper corporate executives, the rif plan for South Bend was approved and George Knox was so advised.

On September 16, 1980, each employee affected by the rif was called into the office of the director for their division and told that they would no longer be employed by Bendix after September 30, 1980. Each individual was given a packet that included a document entitled "Reduction-in-Force, Information for Salaried Employees, September, 1980" which contained information with respect to pay, separation allowances, Salaried Employees' Savings and Stock Ownership Plan, Individual Retirement Accounts, Insurance, Application for Unemployment Compensation Benefits, Outplacement Services, Rehire and Persons with Hourly Seniority. Further, as part of the rif process, an exit interview was held with each employee affected by the rif between the date they were informed of the rif and September 30, 1980.

Both of the plaintiffs were part of the rif in September 1980 because both of their positions were eliminated due to economic austerity. Both of the plaintiffs agreed that the economic climate for ACSG indicated that a rif was needed. The rif request form filled out for Mr. Grabb indicated that he received a performance rating of 3 and possessed a high degree of technical engineering skill which he is able to apply to required tasks. His limitations were that his work planning and report skills were weak and that he did not work well towards deadlines which made him hard to place in other areas. The rif request form noted that he was eligible to be considered for transfer to another department or division of Bendix. Mr. Grabb's position and the program he was working on, the vacuum pump project, were both eliminated so no one performed his specific duties although the engineering function continued to be performed at ACSG. Mr. Grabb elected early retirement and receives $976.75 per month. Mr. Grabb also received a separation allowance of $5,928.75. At the time of Mr. Grabb's exit interview, it was noted that he was eligible for rehire and preferred a job in the South for medical reasons.

The rif request form on Mr. Julow indicated that he received a performance rating of 3 and that his strongest abilities were manufacturing and processing expertise, his familiarity with vendor's situations and Bendix procedures and his ability to identify causes of problems and suggest quick fixes. His limitations were noted to be communication problems, long-term planning and problem solving, and written reports being few and late. The rif request form also noted that his product experience was narrow and not applicable to other job areas and that his problems with communication make him difficult to place in other areas although he was eligible for transfer to another Bendix department or division. After the rif, certain of Mr. Julow's job duties were performed by Henry Dorsett, a Project Engineer whose responsibilities included Master Vac liaison in the Brake & Steering Division. The September 1980 rif resulted in a reorganization of ACSG–Engineering and reduction of departments from 18 to 12 in number. The reorganized ACSG–Engineering required liaison functions at the Hydraulics Division in St. Joseph, Michigan for hydraulic boosters and master cylinders. Mr. Julow did not have experience, knowledge or qualifications necessary for that position. Mr. Julow elected early retirement and receives $986.09 per month. Mr. Julow also received a separation allowance of $6,540.04.

A comprehensive outplacement program was established to assist employees affected by the September 1980 rif as required in Policy 1202. This program was available

to all persons terminated regardless of their job classifications and status. James Richard Wallace was the Manager of Employee Relations at ACSG and it was his responsibility to assist the riffed employees in finding alternative employment. He called in Charlie Pletcher to assist him in doing so. Group meetings were set up to help the riffed employees with respect to interview techniques, resume preparation, and job seeking skills. ACSG also set up an Outplacement Office to assist the riffed employees. Services available in this Office included help in drafting resumes and letters, copying, typing, phone privileges and telephone answering service at no cost to the employee. ACSG subscribed to mailing lists of companies in similar businesses, purchased industrial directories and subscribed to eight major newspapers and posted notice of job openings that were available both locally and nationwide. All of these were available in the Outplacement Office. The outplacement program also included distribution of resumes to over 500 Indiana and Michigan industrial concerns, other Bendix divisions, Bendix corporate headquarters, employment agencies and other companies requesting information on candidates. This distribution occurred as the employees turned in their resumes to ACSG. ACSG also provided space for on-site interviews with companies and placement agencies. Ms. Brown Hayward assisted in the circulation of information to other Bendix divisions.

Mr. Grabb received calls from several employment agencies and got two job offers. One was from Garrent Corporation, Air Research Division, located in Arizona for an annual salary of between $35,000 and $36,000. The job would have required him to work on the MX missile. He had previous experience in that area from working at Bendix's Missile System Division. He turned down that job offer because of the political climate surrounding the MX missile and for family reasons since he did not want to leave the South Bend area. Mr. Grabb also received a job offer from Manufacturing Technologies in Mishawaka, Indiana at a salary of $28,-000.00 per year which he accepted and he is

still working there. Mr. Grabb did not interview at any other Bendix division nor did he receive a job offer at any other division of Bendix at the time of the September 1980 rif.

Mr. Julow received calls from several outside employment agencies. He accepted a job at Goshen Rubber Company in Goshen, Indiana. That job paid less and had less benefits than he was receiving at Bendix before the rif. He did not interview at any other Bendix division nor did he receive a job offer at any other Bendix division at the time of the September 1980 rif.

At the time of or shortly after the September rif at ACSG, there was one opening at the Bendix Friction Materials Division in Troy, New York. The qualifications for that vacant position required an engineer with a chemical background to become a compounder. A compounder is responsible for formulating new friction materials and their related processes. The individual responsible for hiring an individual for that position, Mr. Patrick A. Theisier, reviewed the resumes of Mr. Grabb and Mr. Julow but found that their qualifications did not suit the position. Mr. Theisier selected William Hayes, Jr. to fill the position because his qualifications were suited to the position. William Hayes, Jr. had been an Associate Engineer at ACSG prior to the September rif, having been hired by ACSG on March 12, 1980.

In October 1980, Mr. Richard Riel was promoted from the position of Senior Reliability and Quality Assurance Engineer to Manager of Reliability and Quality Assurance at the Bendix Chassis & Brake Components Division located in St. Joseph, Michigan, leaving a vacancy in that position. The vacancy was a salary grade 26 position and called for a degreed engineer with experience in the Master Cylinder and Hydro-Max product lines. Mr. Riel interviewed candidates for the position and selected John Mackiewicz for the position because of his qualifications, having had experience in both the Master Cylinder and Hydro-Max product lines. Mr. Mackiewicz had been a Senior Engineer at ACSG prior to the September rif, having been hired by

ACSG on June 13, 1977. He graduated from Tri-State University in 1977 with a degree in mechanical engineering. While at ACSG, Mr. Mackiewicz did developmental work on Hydro-Max. After being promoted to Senior Engineer, he was the only engineer responsible for an electronic reserve system related to a brake system that went into production in model year 1980. He got his knowledge of electronics from an electronics lab at home, people at Bendix, self study and courses at Bendix. Mr. Mackiewicz interviewed for this job and one at EC but took this offer at St. Joseph, Michigan because he wanted to stay in automotive, further his production experience and he got a raise. He had prior experience in manufacturing as a co-op at CTS Corporation, had direct product experience and was knowledgeable on master cylinders so his background fit their need at that time. He stayed in that position for 14 months and then transferred back to ACSG on January 1, 1982.

During October 1980, Michael Martin, an engineer working on the tilt steering product line with the ACSG resigned from employment with Bendix. To fill the vacancy created by the resignation, Mr. H.L. McClelland as Director-Product Engineering for ACSG, reviewed the files of those engineers who had recently left Bendix as a result of the rif, including those of Mr. Grabb and Mr. Julow. The only engineer with experience with the tilt steering product line in the files reviewed was Edgar Behrmann. Mr. Behrmann was contacted and accepted an offer of reemployment with ACSG in Department 853, the steering products group. Mr. Behrmann did not have any direct experience in tilt wheel steering at the time of the September 1980 rif but did have some indirect experience from his employment at Chrysler Corporation in Highland Park, Michigan from 1969 through 1973. At Chrysler, Mr. Behrmann was an engineer in the advanced body group and had accumulated knowledge on auto parts from that experience.

At the time of the September 1980 rif at ACSG, there were 7 vacant positions in engineering at EC. There were more openings at this division because it was a larger division. The Employment Requisitions for those 7 openings set forth the needs and requirements for the positions. One position was in Department 863 New Programs-Hydromechanical for a Senior Engineer, Grade 26, 3 to 7 years experience with a degree in Mechanical or Aeronautical Engineering. The work involved design, development, testing and production of new derivative fuel control for single-engine application of F404 engine, i.e. hydromechanical controls for gas turbine engines, and the skill requirements included experience in mechanisms design, fuel control or servomechanisms with knowledge, experience or interest in electronics. The form indicated that EC was seeking a person with primary interest in hydraulics, pneumatics, machine design, servo controls for the positions and would prefer someone who had been exposed to or had working knowledge of fuel control and/or gas turbine operation and was interested in design and hardware.

Three more positions were available in Department 863 New Programs-Propulsion Controls. One of those positions was for a Senior Engineer with the same basic requirements as the position described above in New Programs-Hydromechanical. The other two positions available in New Products-Propulsion controls required the same basic qualifications and job duties. The positions were for a Project Engineer, Grade 29, 7 to 10 years experience with a bachelor, master or Ph.D. degree in Mechanical or Aeronautical Engineering. The positions involved leadership of Project Engineering Group of "New Products" section working on design, development and qualification testing of new hydromechanical/electrical controls and related components for use on large gas turbine aircraft engines. The positions also required the individuals to direct technical and cost proposals preparation, plan program activities, budgets and schedules as well as lead a group of 10 to 15 professional personnel and coordinate development programs with customers. The special skill requirements for the job were demonstrated leadership qualities with a primary interest in hydrau-

lics, pneumatics, machine design, servo controls, electrical/electronic components and interfaces with a working knowledge of fuel control systems and/or gas turbine engine operation.

The last three positions available at EC at that time were in Department 861–Engineering Current Programs and required the same basic qualifications and job duties. The positions were for Engineer or Senior Engineer, Grades 22, 26 or 29, with 2 to 4 years experience and a bachelors degree in Mechanical or Aeronautical Engineering. The position involved project responsibility in design, development and production or manufacturing support, including assembly and test operations for F100 and TF30 Engine Controls as well as hydromechanical control systems. The special skills required of the job were a special emphasis on communications skills since that position required interfacing with a widely diverse group of people and disciplines including vendors, customers (engine companies and military) as well as all staff and operational disciplines within Bendix.

EC received a packet from ACSG of information on people affected by the ACSG September 1980 rif including the resumes of both plaintiffs in this case. Mr. Richard Morrison, an employee in the Personnel Department at EC whose responsibility was professional staffing and staffing of salaried employees, reviewed the resumes in light of the needs within the division as set forth on the requisition forms. In determining whether there was a match of a person with an open position, the salary grade of the individual was taken into account because only a certain salary grade or range had been approved for a certain position and if the maximum salary grade is exceeded by the candidate, reapproval would then have to be obtained. Other factors considered in the initial review were educational background and experience. With respect to education, if an individual had an advanced degree, it generally showed some specialization which could be either an asset or a detriment depending upon the nature of the job opening. Further, the application of engineering in EC required a much higher degree of state of

the art engineering than at ACSG so preference may be given to later college graduates because they would be more up to date on the state of the art technology than earlier graduates but some engineers who graduated in the 1950s may have kept up, particularly if the engineer utilized the general education assistance policy available at Bendix. After the initial review, Mr. Morrison would separate the resumes into two groups: ones with qualifications that closely fit the needs and had a serious likelihood of being considered were grouped together and the other resumes were grouped together. The resumes were than given to the engineering director or manager who had the opening and the engineering department would then determine who to interview. Mr. Morrison stated in his deposition that an engineer that only has had two or three years experience is not so entrenched in a particular type of work or discipline and could be moved into a different assignment and pick up the new assignment more readily than an engineer with more years of experience. Mr. Morrison further noted that an engineer with less experience would no doubt have a more up to date engineering education than one with a long tenure. Jean Rideout, the Director of Employee Relations in EC stated she thought it was the practice of EC to hire recent engineering graduates unless EC was looking for specific skills since the learning curve is rather long whether the individual is a recent graduate or an engineer with several years experience. Ms. Rideout further stated that an engineer with 20 years experience on a product that has no relation to the products involved at EC would be over-qualified for a position requiring 2 to 4 years experience and that it would not make good business sense to consider an over-qualified person since they would still have to go through the learning curve to be able to perform on EC products. Thus, although an engineer with 30 years experience might be considered for a particular position, that engineer would not likely be interviewed if the experience factor set out in the job requisition did not

match the particular individual's level of experience.

EC interviewed several candidates and hired 7 of the engineers that had been affected by the rif at ACSG. Neither of the plaintiffs were interviewed or hired at EC because their qualifications were not as compatible with the job openings as those that were hired. One other engineer, John Mackiewicz, was offered a position with EC but declined in order to accept an offer at another division of Bendix.

Larry Vance was hired for the open position in Department 863 New Programs-Hydromechanical by James Rupp, Supervisor Engineer for EC. Mr. Vance graduated from Purdue University in 1972 and was originally hired at Bendix on June 25, 1979 and at the time of the rif was a Senior Engineer at ACSG. He was hired at EC as a Senior Engineer. While at ACSG, Mr. Vance was involved in testing and development with respect to pneumatic actuation and the vacuum pump. Prior to joining Bendix, he was a supervising project engineer at Chrysler Corporation and his job duties involved support of assembly and manufacturing. Mr. Vance did not find his job at EC much different than the work he was doing at ACSG except that it was a different product.

Larry Portolese was hired for the open position in Department 863 New Programs-Propulsion Controls designated for a Senior Engineer. He was hired as an Engineer. Mr. Portolese received his engineering degree in 1977 from the University of Notre Dame, a B.S. in mechanical engineering, and joined Bendix in 1977 as an Associate Engineer. At the time of the September rif, he was a Senior Engineer. His work at ACSG involved design work, concepts to production. Mr. Portolese interviewed at other Bendix divisions but took the job at EC in new products. His work at EC involved primarily the use of plastics and ceramics in product development and he had had prior experience in new product development use in plastics and ceramics. Mr. Portolese also has a Masters' degree in Business Administration.

Hugo Novias De Campos and David Lawrence were hired by EC for the other two openings in Department 863 designated for Project Engineers. Both were hired as Senior Engineers by James Rupp. Mr. De Campos graduated from Brigham Young University in 1973 with a Bachelor and Masters' degree in Mechanical Engineering and joined Bendix the same year. Mr. De Campos had a good background in heat transfer and his masters' degree was a plus for this position. At ACSG he was a Senior Engineer doing research and development on the vacuum pump project. His work at EC involved a higher level of technical problems that his work at ACSG. David Lawrence graduated from Purdue University in 1972 with a degree in Mechanical Engineering. In 1980, he was a Senior Engineer at ACSG working in the brake hydraulics section. At EC he was working on new controls for large gas turbine engines including digital electronic engine control. Customer contact at EC was an important part of his job.

Louis S. Tang, Bruce Miller and Roger Miller were the three individuals hired by EC in Department 861–Engineering Current Programs. Roger Miller graduated from Tri-State University in 1977 with his degree in Mechanical Engineering and started at Bendix the same year. His work at ACSG primarily involved current engineering and advanced work on master cylinders which he found helpful at EC. Roger Miller worked at EC for 8 months but was dissatisfied and transferred back to ACSG to take a position needing an experienced master cylinder person. Louis S. Tang graduated from the University of Portland in 1969 and received a Master's Degree from the University of Notre Dame in Mechanical Engineering with a specialty in applied mechanics. Mr. Tang joined Bendix in July 1974. Before that time, he did engineering work at the University of Notre Dame as a research assistant. Mr. Tang had also done work as an Engineering Technician for Shell Oil Company. When Mr. Tang joined Bendix as an Engineer in July 1974 he was assigned to do development work on hydraulic boosters, primarily aimed at reducing the costs

thereof and making the product less bulky. Both of these goals were accomplished and acknowledged by Ford Motor Company, the customer involved in the project. The resulting product was called Hydroboost 1. Mr. Tang also did current engineering, worked on quality control and was the coordinator for a new product called the Light Weight Mini-Master Cylinder. Mr. Tang was responsible for bringing this product into production in Canada in 1977. He then went back to South Bend and worked on Hydroboost 2 to further reduce the size and weight and also worked on using Hydroboost 1 in off-highway vehicles. The last performance evaluation received by Mr. Tang before the September rif was a 4. He received the performance evaluation on his last working day at Bendix before the layoff was announced since he was on vacation for awhile in early September 1980. Mr. Tang talked to William Birge, a Vice President at ACSG because he thought the performance evaluation was unfair since Mr. Messersmith did the evaluation and Mr. Tang had only worked under him for 3 or 4 months. Mr. Tang thought his evaluation should be a 3 or 3+ and thought a 4 would hurt his chances of getting another job. Mr. Birge said he would look into it. The performance evaluation was removed from Mr. Tang's personnel file. Mr. Tang interviewed with EC and was offered a position there. Mr. Tang showed Mr. O'Reilly the performance evaluation done by Mr. Messersmith and Mr. O'Reilly indicated that his offer still stood. Mr. Tang works on hydraulic control devices at EC.

Prior to the first rif in August 1979, there were 860 employees in ACSG. Of those 860 employees, 355 or 39% were under 40 and 525 or 61% were over 40. In the first 4 rifs, 95 employees were separated from ACSG which constituted 11% of the total work force. Seventy (70) of those employees were under 40 which equaled 20.9% of the total under 40 work force and 25 of those employees were over 40 which equaled 4.8% of the total over 40 work force. Or, in other words, 74% of those separated were under 40 and 26% of those separated were over 40. At the time of the

5th rif in September 1980, there were 707 employees at ACSG, 242 or 34% were under 40 and 465 or 66% were over 40. In rif number 5, 99 employees were separated from employment with ACSG which constituted 14% of the work force. Forty-nine (49) were under 40 which equaled 20.2% of the under 40 work force and 50 were over 40 which equaled 10.8% of the over 40 work force. The total under 40 employees separated from employment in ACSG as a result of the 5 rifs was 119 and the total over 40 was 75. Thus 61% of those separated were under 40 and 39% were over 40.

In ACSG–Engineering prior to the 1st rif, there were 331 employees of which 140 employees or 42% were under 40 and 191 employees or 58% were over 40. In ACSG–Engineering, the first four rifs resulted in 26 employees or 7.9% of the work force being separated from employment. Of those 26 employees, 23 were under 40 which equaled 16.4% of the under 40 work force and 3 employees or 1.6% of the over 40 employees were separated from employment. Thus 88% of those separated were under 40 and 12% of those separated were over 40. At the time of the 5th rif in September 1980, there were 280 employees in ACSG–Engineering of which 104 or 37% were under 40 and 176 or 63% were over 40. In rif number 5, 65 employees were separated from employment with ACSG–Engineering which constituted 23.2% of the work force. Of those 65 employees, 34 were under 40 which equaled 32.7% of the under 40 work force and 31 were over 40 which equaled 17.6% of the over 40 work force in ACSG–Engineering.

Within ACSG–Engineering, the job categories can be broken down by job function. For purposes of the issues in this case, the category involving the job function of engineering is appropriate. The engineering category includes the job classifications of Director of Product Engineering, Associate Engineer, Engineer, Senior Engineer, Principal Engineer, Staff Engineer, Senior Staff Engineer, Manager Engineering, Project Engineer and Supervisory Engineer. In 1980, there were 90 employees in this category including 14 Engineers, 2 As-

sociate Engineers, 28 Senior Engineers, 10 Staff Engineers, 2 Senior Staff Engineers, 19 Project Engineers, 3 Directors of Product Engineering, 1 Principal Engineer, 8 Managers of Engineering, and 3 Supervisory Engineers. In this engineering group, 26 employees were affected by the 5th rif. Those 26 included 1 Director of Product Engineering, 5 Engineers, 2 Associate Engineers, 11 Senior Engineers, 5 Staff Engineers, 1 Senior Staff Engineer, and 1 Project Engineer.

The group of 90 employees in the engineering group included 53 employees under the age of 40 and 37 over the age of 40. Sixteen of the under 40 group were affected by the 5th rif which equals about 30% of the under 40 age group and 10 of those employees over 40 in the engineering group were affected by the 5th rif which equals 27% of that age group. Professor George P. McCabe also did a statistical analysis on the average age and length of service with respect to those employees who were riffed and those not riffed and found that the differences were not statistically significant with the average age of the riffed employees being 39.48 years with 11.35 years of service and the average age of the employees that were not riffed being 39.66 years with 13.03 years of service. Although Professor McCabe's analysis is based on a data base of 103 instead of 90 as used above, the differences in the overall result are very minimal.

Professor McCabe then focused on three classifications within the engineering group—Staff Engineer, Senior Staff Engineer and Project Engineer. In considering the factor of age only, i.e. comparing the number of employees over age 40 and those under age 40 in terms of being riffed or not riffed, Professor McCabe found that the difference was not statistically significant. However, Professor McCabe did find the average age and length of service differences between those riffed and not riffed in this subgroup statistically significant based on the average age of not riffed employees being 40.75 years with 11.66 years of service as compared to riffed employees with an average age of 50.45 years and 21.7 years of service. Professor

McCabe concluded that this result was not attributable to chance and in the absence of other explanatory factors lead to a conclusion that age was a factor in the treatment of the employees in that subgroup.

At the time of the September 1980 rif, all of the Staff Engineers and Senior Staff Engineers were over 40 years of age and 5 of the 19 Project Engineers were over 40 years of age. None of the over 40 Project Engineers were affected by the rif. Prior to the September rif, the average age of the Staff Engineers was 52.33 years, Project Engineers was 37.56 years and Senior Staff Engineers was 47.04 years. After the 5th rif under the new organizational structure, there were 14 Staff Engineers and only 3 of those were under 40 years of age.

The latest performance evaluations prior to the September rif of the employees in ACSG reveals that the overwhelming majority of all scores fell in the range between 3 and 2+. The average score overall for those over 40 and those under 40 was virtually the same, a 2–, as was the average score for those retained the same between the 2 age groups. Further, the average performance rating of those separated from employment in the 5th rif was lower than those retained. The performance evaluations of the 10 Staff Engineers before the rif reveals that there were 4 who received a performance rating of 3+, 2 that received a rating of 3 and 4 that received a rating of 2–. The Staff Engineers separated from employment at the 5th rif included 2 that had received a score of 3, 2 a score of 3+ and 1 a score of 2–.

Of the under 40 engineers affected by the 5th rif, 14 were granted interviews with other divisions of Bendix and 13 of those individuals received job offers. None of the over 40 age group of engineers were interviewed or received job offers although 2 of those individuals, Donald Stevens and Jerry Woo did not want to be transferred. Professor McCabe concluded that this result was not attributable to chance and in the absence of other explanatory factors lead to a conclusion that age was a factor in the treatment of those employees.

After the September 1980 rif, ACSG has had 30 to 50 openings. There is no indication in the record as to the job function of those positions, classification of those positions, qualifications for those positions, who was selected, why the person was selected or if the plaintiffs were considered. Neither of the plaintiffs have been interviewed or offered jobs with ACSG since their separation from employment.

ACSG had posted the required ADEA notice and both plaintiffs filed charges with the EEOC. Conciliation efforts were not successful and plaintiffs filed this case.

## II.

■ Congress passed the ADEA for the purpose of promoting "employment of older persons (ages 40 to 70) based on ability rather than their age." 29 U.S.C. § 621; *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421 (7th Cir.1986); *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210 (7th Cir.1985). To carry out this purpose, the ADEA provided that:

"(a) It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;"

29 U.S.C. § 623(a). Thus, to establish a violation of the ADEA, a plaintiff must prove that an adverse employment decision was made *because* of his age. *Dorsch, supra* at 1423; *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984); *Parker v. Federal National Mortgage Ass'n*, 741 F.2d 975, 978 (7th Cir.1984); *Huhn v. Koehring Co.*, 718 F.2d 239, 243 (7th Cir.1983); *Golomb v. Prudential Insurance Co. of America*, 688 F.2d 547, 550 (7th Cir.1982). To accomplish this, a plaintiff must prove not that age was the sole factor motivating the employer in the employment decision but that age was a "determining factor" in the sense that the employee would not have been discharged or would have been hired "but

for" the employer's motive to discriminate because of age. *Dorsch, supra* at 1424; *La Montagne, supra* at 1409; *Golomb, supra* at 551; *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1222 (7th Cir. 1980).

■ A plaintiff may prove his case of age discrimination with direct or circumstantial evidence. *Johnson v. University of Wisconsin-Milwaukee*, 783 F.2d 59, 63 (7th Cir.1986); *Dorsch, supra* at 1424; *La Montagne, supra* at 1409. The more common method, however, is to use the method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and further explained in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Johnson, supra* at 63; *Dorsch, supra* at 1424; *Tice, supra* at 1212; *La Montagne, supra* at 1409. Although *McDonnell Douglas* was a case involving a complaint of discrimination under Title VII of the Civil Rights Act of 1964, courts have applied the method of proof set forth therein to cases of alleged age discrimination. *See, e.g., Johnson v. University of Wisconsin-Milwaukee, supra* at 63; *Klein v. Trustees of Indiana University*, 766 F.2d 275, 282 N. 4 (7th Cir.1985); *Parker, supra* at 978; *Monroe v. United Air Lines, Inc.*, 736 F.2d 394, 402–03 (7th Cir.1984); *Huhn, supra* at 243. Under *McDonnell Douglas* as clarified and explained in *Burdine*, a plaintiff must first establish a *prima facie* case of discrimination. If a plaintiff establishes his *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its decision and if defendant does so, the plaintiff must prove that the employer's articulated reason is actually a pretext or cover-up for discrimination. *See, e.g., Texas Dept. of Community Affairs v. Burdine, supra; McDonnell Douglas Corp. v. Green, supra; Johnson, supra* at 63; *Dorsch, supra* at 1424; *Tice, supra* at 1212–13; *Trembath v. St. Regis Paper Co.*, 753 F.2d 603, 604 (7th Cir.1985); *see also Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508 (7th Cir.

1986).[1] However, despite the shifting burden, the plaintiff has the ultimate burden of persuasion that "but for" his age, he would not be adversely affected by an employment decision. *Johnson v. University of Wisconsin-Milwaukee*, 783 F.2d 59, 63 (7th Cir.1986); *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1217 (7th Cir.1985); *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984).

■ The *prima facie* case element of the *McDonnell Douglas* test is flexible and may be adapted to the fact situation as appropriate. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 252 n. 5, 101 S.Ct. at 1093 n. 5; *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d at 511 n. 4; *Dorsch v. L.B. Foster Co.*, 782 F.2d at 1424 n. 3. In this case, the plaintiffs are basically alleging two claims of discrimination: discriminatory discharge and discriminatory failure to hire. Since the discharge of both plaintiffs in this case was in the context of a reduction in force, the court may look to other cases involving a similar situation to ascertain the appropriate elements of a *prima facie* case. In a rif case, a plaintiff establishes a *prima facie* case by showing that: (1) he was within the protected age group; (2) he was adversely affected, i.e., discharged; (3) he was qualified to assume another position at the time of the adverse employment decision; and (4) the employer filled the job by selecting a younger person outside the protected age group or by producing circumstantial or direct evidence from which a fact finder might conclude that the employer intended to discriminate in reaching the decision at issue. *See, e.g., Dorsch v. L.B. Foster Co.*,

782 F.2d at 1424; *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93 (7th Cir.1985); *Matthews v. Allis-Chalmers*, 769 F.2d at 1221; *Tice v. Lampert Yards, Inc.*, 761 F.2d at 1215 n. 5; *Trembath v. St. Regis Paper Co.*, 753 F.2d at 604; *Williams v. Motors Corp.*, 656 F.2d 120, 129 (5th Cir. 1981); *Bates v. Carborundum Co.*, 623 F.Supp. 613, 618 (N.D.Ind.1985).[2] On a failure to hire claim, a plaintiff establishes a *prima facie* case by showing that: (1) he was within the protected age group; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) the employer hired someone not in protected age group. *See McDonnell Douglas Corp. v. Green, supra; Matthews v. Allis-Chalmers*, 769 F.2d at 1220. Successfully establishing a *prima facie* case gives rise to an inference or rebuttable presumption of discrimination but it is not the equivalent of a factual finding to that effect. *See, e.g., Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d at 512; *Dorsch v. L.B. Foster Co.*, 782 F.2d at 1424; *Klein v. Trustees of Indiana University*, 766 F.2d at 280.

Upon the plaintiff showing a *prima facie* case, the burden shifts to the defendant to rebut the inference or presumption of discrimination by articulating a legitimate, nondiscriminatory reason for its employment decision. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Yarbrough, supra* at 511; *Dorsch, supra* at 1424; *Tice v. Lampert Yards, Inc.*, 761 F.2d at 1212–13. The employer's burden of showing a nondiscriminatory reason is only one of production, not persuasion, *Burdine, supra* at 1424; *Tice,*

---

**1.** In this case, the plaintiffs have only alleged, briefed and argued disparate treatment claims and have made no reference to disparate impact claims. Accordingly, this court views this case as involving only claimed disparate treatment which requires the showing of discriminatory intent or motive unlike a disparate impact claim which does not require such a showing. *See, e.g., Babrocky v. Jewel Food Co. & Retail Meatcutters*, 773 F.2d 857, 866 n. 6 (7th Cir.1985); *see also Regner v. City of Chicago*, 789 F.2d 534 (7th Cir.1986); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir.1986).

**2.** The elements for a *prima facie* case of straight discharge are very similar to the elements of a *prima facie* case in a discriminatory discharge claim in a rif situation although the fourth element is somewhat different. *See, e.g., Yarbrough v. Tower Oldsmobile, Inc., supra; Johnson v. University of Wisconsin-Milwaukee*, 783 F.2d at 63; *Mason v. Pierce*, 774 F.2d 825, 828 (7th Cir.1985); *Matthews v. Allis-Chalmers*, 769 F.2d at 1217; *La Montagne v. American Convenience Products, Inc.*, 750 F.2d at 1409; *Huhn v. Koehring Co.*, 718 F.2d at 242–43.

*supra* at 1213 n. 2, and the employer can accomplish this by introducing admissible evidence of the reasons for its employment decision. *Dorsch, supra.*

■ If a defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted and the factual inquiry leads to a new level of specificity: the plaintiff must then show that the employer's proffered reason is merely a pretext or cover-up for discrimination. *See Dorsch, supra* at 1424; *Klein v. Trustees of Indiana University,* 766 F.2d at 280; *Golomb, supra* at 551. The plaintiff can show pretext in one of two ways: (1) that the employer was more likely motivated by a discriminatory reason; or (2) that the employer's proffered reason is unworthy of credence. *Burdine, supra* at 253–54, 101 S.Ct. at 1094; *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d at 513; *Johnson v. University of Wisconsin-Milwaukee,* 783 F.2d at 63; *Klein, supra* at 282. A plaintiff can show that the employer's proffered reason is unworthy of credence in 3 ways: (1) the company's reasons have no basis in fact; or (2) if they have a basis in fact, by showing that they were not really motivating factors; or (3) if they are factors, by showing they were jointly insufficient to motivate the adverse employment decision, i.e., the proffered reason was so removed in time that it was unlikely to be the cause or the proffered reason applied to other employee with equal or greater force and the company made a different decision with respect to them. *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1414 (7th Cir.1984). Further, it is not the court's duty to determine the validity of a defendant's employment decision as long as the decision was made in good faith, and, the company's reason is not a pretext if in the exercise of its business judgment it made a good faith evaluation. *Dorsch, supra* at 1426; *Johnson, supra* at 63; *Tice, supra* at 1215 n. 6. In a rif situation, an evaluation is made in good faith if it was genuinely and honestly made in an attempt to

select the employees to be retained on the basis of performance related considerations and a subjective qualification assessment does not convert an otherwise legitimate decision into an illegitimate one. *Dorsch, supra* at 1426–27.

At this stage of the process, the plaintiff's rebuttal evidence must focus on the defendant's specific reason for taking the challenged employment decision. *Dorsch, supra* at 1425; *La Montagne, supra* at 1415; *Klein, supra* at 282. Further, it is not enough to show that the employer's reasons were not the real reasons, were false or were merely a pretext. *See, e.g., Golomb, supra* at 551. The plaintiff must show that they were a pretext for discrimination. *See, e.g., Johnson, supra* at 64. Thus, a business decision of an employer need not meet the unqualified approval of a judge or jury so long as the decision was not based on age. *Id.; see Kephart v. Institute of Gas Technology,* 630 F.2d at 1233. So, absent discriminatory intent, an employment discrimination action is not an appropriate forum in which to question an employer's business judgment. *La Montagne,* 750 F.2d at 1409; *Huhn v. Koehring Co.,* 718 F.2d 239, 243–44 (7th Cir. 1983); *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1220, 1222–23 (7th Cir.1980).

## A. *Discharge Claim*

■ In this case, Bendix eliminated plaintiffs' positions as well as 24 other engineering positions in a reduction-in-force situation. The plaintiffs do not dispute that business conditions dictated a need to cut back the salaried work force in making the decision. Nor does the record indicate that plaintiffs are claiming that Bendix's decision with respect to the reorganization structure was discriminatory. Rather, plaintiffs' claims of age discrimination with respect to the discharge claim is that they should have been retained in the reorganized structure of ACSG–Engineering in place of other younger employees that were retained.[3]

---

3. The plaintiffs cannot rely on any evidence with respect to the hiring of some of the riffed

engineers by other Bendix divisions for support for their discriminatory discharge claim for two

Both plaintiffs have shown that they were within the protected age group and that they were adversely affected. Further, viewing the record in the light most favorable to the plaintiffs, it appears that one could reasonably conclude that both were performing their respective jobs at a level that met Bendix's legitimate expectations. Mr. Grabb was promoted from Senior Engineer to Staff Engineer and received a 3+ performance evaluation as well as a raise in May 1980. There is no doubt that he was performing satisfactorily and indeed had improved substantially over recent years. Mr. Julow had been switched from Project Engineer to Staff Engineer in May 1980 because of his written communication problems but again he had received a performance evaluation of 3- meets requirements—and Bendix had noted his strengths on the evaluation. Accordingly, the plaintiffs have met the third element of a *prima facie* case in a discharge situation by showing they were "qualified." *See, e.g., Mason v. Pierce,* 774 F.2d 825, 829 (7th Cir.1985); *La Montagne,* 750 F.2d at 1409 n. 2; *Huhn,* 718 F.2d at 243–44; *Kephart,* 630 F.2d at 1220. The focus therefore must be on the fourth element of the *prima facie* case.

The plaintiffs maintain that they were essentially replaced by younger persons in that other persons were doing their job. The record reveals, however, that both of their positions were eliminated. In fact, the entire vacuum pump project that Mr. Grabb was working on was scrapped by ACSG at the time of the rif and reorganization. Mr. Grabb maintains, however, that he could perform work done by other engineers on other projects in ACSG and that Bendix should have bumped one of those employees and given Mr. Grabb the position although he never identified any particular position. The ADEA, however, does not place an affirmative duty on an employer to accord special treatment to members of the protected age group but rather mandates that an employer reach the decision on who to retain without regard to age.

*Tice v. Lampert Yards, Inc.,* 761 F.2d at 1217; *Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981). Accordingly, Mr. Grabb has not shown that he was replaced by a younger person outside the protected age group. With respect to Mr. Julow, his position was also eliminated. Although some of his functions were performed by others that were not within the protected age group including his immediate supervisor. There is no evidence that he was replaced by anyone in particular. Mr. Julow has not shown that he was replaced by a younger person either. However, in a rif discharge situation, a plaintiff may not need to show that he was replaced by a younger person to establish a *prima facie* case. *See Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 96 (7th Cir. 1985); *Matthews v. Allis-Chalmers,* 769 F.2d at 1217; *Tice v. Lampert Yards, Inc.,* 761 F.2d at 1215 n. 5; *Williams v. General Motors Corp.,* 656 F.2d 120, 128–29 (5th Cir.1981). A plaintiff can show the fourth element by producing direct or circumstantial evidence from which a fact finder might reasonably conclude that the employer intended to discriminate on the basis of age in reaching its decision on who will be separated from employment in a rif situation.

The record discloses no direct evidence that age was a determining factor in Bendix's decision as to which individuals would be affected by the rif in September 1980. The court must therefore consider whether the record contains circumstantial evidence from which a fact finder could reasonably conclude that age was a determining factor in Bendix's decision to discharge plaintiffs.

The plaintiffs claim that the fact that they were classified as Staff Engineers just before the September 1980 rif was part of a plan to rif older employees and adversely affected their chances of surviving the rif thereby showing that age was a factor in Bendix's decision. The evidence in this record simply does not support this assertion. First, plaintiffs were classified as

reasons. First, the decisions with respect to hiring by other divisions were made by a totally different group of individuals than the ones

involved in the rif and two, the hiring decisions were made after the rif decisions. *Cf. La Montagne, supra* at 1412.

Staff Engineers in May 1980 which was before anyone at ACSG knew anything about the need for the September rif. Second, Mr. Grabb had requested to be and was promoted to Staff Engineer from Senior Engineer, after having been demoted to Senior Engineer 1½ years before. Further, the record reveals that the last time Mr. Grabb had been classified as a Project Engineer was in March 1978. With respect to Mr. Julow, his classification as Staff Engineer was due to his difficulties in communication and Bendix's desire to therefore have him report to someone else. Third, there is no evidence that the classifications of the plaintiffs as Staff Engineers was on the basis of their age pursuant to any plan. Bendix had a dual path program which recognized the different interests and capabilities of engineers in ACSG–Engineering. One path recognized individuals with interests or capabilities for management and supervision and the other path recognized individuals with interests or capabilities on the technical side of engineering. Neither of these plaintiffs possessed the interest and/or capabilities necessary for the management/supervision side. Accordingly, this assertion does not form the basis for a reasonable inference that age was a factor in Bendix's decision to discharge plaintiffs in this case.

The plaintiffs also submitted statistical evidence which they maintain shows that age was a factor in Bendix's decision to discharge them. The Supreme Court of the United States and the Seventh Circuit Court of Appeals have recognized that statistical evidence can be used to establish a *prima facie* case in employment discrimination actions, *see, e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *Babrocky v. Jewel Food Company and Retail Meatcutters,* 773 F.2d 857, 867 (7th Cir.1985), and may also be used to show an employer's reason for an employment decision was a pretext for discrimination. *Dorsch v. L.B. Foster Co.,* 782 F.2d at 1427; *Herman v. National Broadcasting Co., Inc.,* 744 F.2d 604, 610 (7th Cir.1984); *Box v. A & P Tea Co.,* 772 F.2d 1372, 1379 (7th Cir.1985).

However, although statistics may be some aid in showing discriminatory intent, they are not significant in age discrimination cases unless the disparities in treatment are quite large because "in the usual case, absent any discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are constantly moving out of the labor market, while younger ones move in." *Dorsch, supra* at 1427; *Kephart, supra* at 1224; *Laugesen v. Anaconda Co.,* 510 F.2d 307, 313 (6th Cir.1975). Further, the statistical evidence must be relevant to the issue and be trustworthy. Thus, if the issue is discriminatory discharge, the statistics must show older employees discharged at a significantly higher rate than young employees, *cf. Box v. A & P Tea Co.,* 772 F.2d at 1379–80, and the statistical evidence must have sufficient breadth to be trustworthy. If a small change in the underlying data would result in dramatic statistical fluctuations or if there is a small sample size and a party has used a selective manner of categorization, the statistical evidence may not be trustworthy and may therefore prevent the statistical evidence from giving rise to a reasonable inference of discriminatory intent or motive. *Dorsch, supra* at 1427 n. 6; *Parker v. Federal National Mortgage Ass'n,* 741 F.2d at 980; *Kephart, supra* at 1224. Finally, a defendant can attack the statistical evidence for accuracy, reliability or appropriateness to the question at issue. *Babrocky v. Jewel Food Co. & Retail Meatcutters,* 773 F.2d at 867.

The record in this case reveals that the 5 rifs at ACSG from August 1979 through September 1980 resulted in a significantly larger number of employees under the age of 40 being separated from employment with Bendix than the number of employees that were separated in the protected age group. Further, the disparity in treatment between the two groups was even more significant when considered in light of the age distribution between the two groups before the first rif as well as at the time of the 5th rif. The statistics for ACSG–Engineering with respect to the rifs reveal the

same adverse impact on the under 40 age group as the statistics for ACSG overall. Further, the average age and median age of ACSG employees also rose as a result of the rifs. Accordingly, this statistical evidence does not support any inference of discriminatory motive on the part of Bendix with respect to the discharge of plaintiffs.

Likewise, the statistics with respect to the job function of engineering within ACSG–Engineering also does not give rise to any inference of discriminatory motive or intent. There were 16 engineers under the age of 40 separated and 10 engineers over the age of 40 separated as a result of the September 1980 rif. Although it would appear that the rif impacted more on the under 40 age group, the difference in treatment was not statistically significant but certainly was not supportive of plaintiffs claim of discrimination.

The plaintiffs then presented statistics on a further subgroup of the engineering function within ACSG–Engineering focusing on three classifications of engineers—Senior Staff Engineers, Staff Engineers and Project Engineers. The difference in treatment between the over 40 age group and the under 40 age group for these 3 classifications with respect to rif status based on the factor of age alone was not statistically significant according to plaintiff's statistical expert. It was only when comparing the average age and length of service of those riffed as compared with those that were not riffed that the plaintiffs' expert found significant disparity in treatment. This statistical evidence, however, cannot support an inference of discriminatory intent or motive in this case for several reasons. First, length of service has no bearing on the issues in this case since the focus is on age. Second, there is no evidentiary basis for grouping these three classifications together for purposes of statistical analysis in this case. Neither plaintiff had ever been a Senior Staff Engineer and Mr. Grabb had not been a Project Engineer for over two years. Further, as indicated above, age was not a criteria in assigning individuals to certain classifications-interest and capabilities were the criteria. Accordingly, no inference of discrim-

inatory motive or intent can reasonably be drawn from this statistical evidence.

Plaintiffs also claim that discriminatory intent can be inferred from three other facts: (1) the "stashing" of Dave Krebs and the transfer of George Pope and James Putt just prior to the 5th rif; (2) Bendix's failure to follow its rif policy including the consideration of the performance evaluations of individuals in determining who was to be separated from employment; and (3) the "mature work force problem" at Bendix. The court finds that these facts, whether considered alone or collectively, cannot form the basis for any reasonable inference of discriminatory motive or intent in this case.

With respect to the "stashing" of Dave Krebs, the undisputed facts reveal that he could speak French, had wanted to go on the Bendix exchange program for several years and that his qualifications fit an available opening in France. There is no evidence in the record that age had anything to do with Mr. Schaefer's efforts to have him transferred. The mere fact that he was under the age of 40 does not permit an inference that plaintiffs were discharged because of their age. *Cf. La Montagne*, 750 F.2d at 1412.

Likewise, the fact that 2 other under 40 engineers whose names initially appeared on a rif list were transferred before the actual rif occurred cannot form the basis of a reasonable inference of discriminatory intent. The evidence reveals that informal efforts were made on behalf of all ACSG–Engineering employees before the rif and the mere fact that there were 2 openings which required the qualifications of 2 engineers who happened to be under the age of 40 does not provide a basis for inferring that plaintiffs were discharged because of their age. The chain of inference is too tenuous for a reasonable jury to adopt it.

The same result must be reached with respect to Bendix's failure to follow its rif policy. The undisputed facts reveal that Bendix followed its rif policy to the extent possible given the time limitations and that the time limitations required Bendix to do

some of the steps concurrently rather than consecutively. Again, it would be pure speculation to infer the reason was for the purpose of discriminating against plaintiffs on the basis of their age. Further, the statistics on the performance evaluations of those riffed and not riffed does not support plaintiffs' assertions.

Finally, the plaintiffs reference to the "mature work force problem" at Bendix is also not probative of discriminatory intent with respect to their discharge. That phenomena was ascertained several years before the September 1980 rif and the fact that ACSG tried to recruit younger engineers to avoid being left without any engineers because of retirement and transfer does not give rise to a reasonable inference that plaintiffs were discharged because of their age. This court need not consider every conceivable inference but only need consider reasonable inferences. *Matthews*, 769 F.2d at 1218; *Parker*, 741 F.2d at 980. Accordingly, plaintiffs have failed to show the 4th element of a *prima facie* case of discriminatory discharge.

Even assuming, however, that plaintiffs have presented enough evidence to show a *prima facie* case of discriminatory discharge, the defendant has articulated a legitimate, nondiscriminatory reason for its employment decision: the engineers retained were more qualified to perform the work remaining in ACSG–Engineering after the rif and reorganization. *See, e.g., Matthews*, 769 F.2d at 1218; *Christensen v. Equitable Life Assur. Soc. of U.S.*, 767 F.2d 340 (7th Cir.1985); *Parker, supra; Bates v. Carborundum Co.*, 623 F.Supp. 613, 619 (N.D.Ind.1985). Thus, the burden shifted back to the plaintiffs to show that the proffered reason was merely a pretext for discrimination. At this stage of the *McDonnell Douglas* method of proof, the plaintiffs must focus on the specific reasons proffered by defendant.

The plaintiffs claim that the defendant's proffered reason for plaintiffs discharge was a pretext because it was unsupported by any reference to the record. The court

finds this assertion unpersuasive. First, the defendant's burden is one of production, not persuasion, and the defendants have introduced evidence in the form of testimony of Bendix's reason for retaining the employees it did at ACSG. Thus, the plaintiffs must show that Bendix's decision was unworthy of credence or that Bendix was more likely motivated by a discriminatory reason. There is no evidence in this record that Bendix's reason has no basis in fact nor that the relative qualifications of individuals for a particular position were not really the motivating factor in Bendix's employment decision. The plaintiffs have not presented any evidence that their qualifications were superior for any particular position in the reorganized ACSG than the individual chosen to fill that position nor have plaintiffs produced any evidence that casts any doubt on Bendix's stated reason. Further, there is no evidence in the record that shows or from which a reasonable inference could be drawn that Bendix was more likely motivated by plaintiffs' age in deciding who to discharge at ACSG. Thus, the plaintiffs have failed to show or present evidence that casts doubt upon Bendix's reason for discharging plaintiffs and thus have failed to show that the stated reason was merely a pretext for discrimination. Accordingly, the plaintiffs have failed to show that they were discharged because of their age and defendant's motion for summary judgment must be granted as to the plaintiffs' discriminatory discharge claim.

B. *Failure to Hire Claim*

Turning now to plaintiffs' claim of discriminatory failure to hire, the court again must begin with whether the plaintiffs have established a *prima facie* case of age discrimination with respect to Bendix's failure to rehire or transfer plaintiffs to other available positions with Bendix at the time of the September 1980 rif. The plaintiffs have shown that they were within the protected age group, that there were available job openings at other divisions of Bendix, that they applied for those jobs [4] but were

---

**4.** Bendix's policy 1202 required that the resumes of all riffed employees be sent to other Bendix divisions for consideration for any job openings. Accordingly, the court will assume that

rejected and that Bendix hired younger persons to fill those openings that were not within the protected age group. The focus must therefore be on the *prima facie* element of whether the plaintiffs were "qualified" for those openings.

The meaning given to the term "qualified" depends on the nature of the employer's business at the time the employment decision was being made. *Dorsch, supra* at 1425; *Kephart, supra* at 1219. Thus, the fact that an individual is hired at one time does not necessarily mean that the individual is qualified at another time because there is a shifting nature to the term qualified and to ignore that shifting nature would make the qualification requirement meaningless. *Dorsch, supra* at 1425; *Kephart, supra* at 1219–20. Further, a certain college degree does not *ipso facto* qualify an individual for a particular position. *Id.*

With this background in mind, the court will turn to the evidence in this case to see whether plaintiffs were "qualified" for the openings at the other Bendix divisions. The undisputed facts disclose that there was 1 opening at the Friction Material Division in Troy, New York at the time of the September rif. The qualifications for that position required an engineer with a chemical background to become a compounder. There is no evidence that either plaintiff had any background in chemical compounding. Accordingly, the plaintiffs have failed to prove a *prima facie* case of discriminatory failure to hire for this position.

The opening at the Bendix Chassis & Brake Division in St. Joseph, Michigan called for a degreed engineer, grade 26, with experience in Master Cylinder and Hydro-Max product lines. Both of the plaintiffs were grade 29 and neither had the appropriate product line experience. Accordingly, again the plaintiffs have failed to show that they were "qualified." The evidence reveals that the same situation is present with respect to the opening at ACSG in October 1980 which was filed by Edgar Behrmann—the plaintiffs did not

have the product line experience needed to fill the position.

The evidence reveals that there were 7 openings at EC at the time of the September rif at ACSG and all of those openings required a degree in Mechanical or Aeronautical Engineering. The plaintiff Mr. Julow did not have an engineering degree in either one of those areas so he did not even meet a basic, objective qualification for any of those 7 positions. Further, the job requisition forms for the positions at EC disclose that two of the openings were for a Senior Engineer with 3 to 7 years experience, two of the openings were for Project Engineers with 7 to 10 years experience and 3 of the openings were for an Engineer or Senior Engineer with 2 to 4 years experience. Both plaintiffs had over 29 years of experience so neither of plaintiffs experience factor was compatible with any of the experience requirements for the 7 positions. Further, 3 of the positions required strong communication skills and 2 of those positions required supervision skills—again qualities that were not strong points of either plaintiffs. Thus, plaintiffs have failed to show they were "qualified" for these positions and thus failed to show one of the elements of a *prima facie* case of discriminatory failure to hire.

The plaintiffs have also presented statistical evidence in support of their failure to hire claim. That statistical evidence reveals that none of the over 40 engineers separated from ACSG at the time of the September 1980 rif were interviewed or offered jobs at other Bendix divisions whereas 14 of the under 40 age group were interviewed and 13 of those individual received offers of employment with other Bendix divisions. Based on these facts, plaintiffs' statistical expert concluded that in the "absence of other explanatory factors" age was a factor in the treatment of the over 40 age group with respect to Bendix hiring decisions.

Based on the numbers noted above, it would appear that a reasonable inference

---

the plaintiffs applied for the job openings available. *Cf. Box v. A & P. Tea Co.,* 772 F.2d 1372

(7th Cir.1985).

could be drawn that age was a factor in Bendix's hiring decision. However, even plaintiffs' expert noted that such a conclusion was in the "absence of other explanatory factors" and the evidence in this case reveals that there were "other explanatory factors" present in this case. First, two of the engineers in the protected age group did not even want to be considered for transfer to other Bendix positions. Second, the evidence reveals that neither of the two plaintiffs in this case were "qualified" for 10 of the job positions filled by the under 40 engineers. The other 3 positions filled by under 40 engineers were not identified nor were the qualifications of those positions disclosed in the evidence. Further, there is no evidence in the record with respect to the qualifications of the other over 40 engineers. Thus, the reasonableness of the inference that age was a determining factor in Bendix failure to hire based on the statistical evidence alone becomes questionable, particularly with reference to the record as a whole.

However, even assuming plaintiffs have presented sufficient evidence to show a *prima facie* case of discriminatory failure to hire, Bendix has articulated legitimate, nondiscriminatory reasons for their hiring decisions: relative qualification of the individuals. Thus, the burden shifted back to plaintiffs to show that Bendix's reason was merely a pretext for discrimination.

The plaintiffs point to several facts which they assert show that defendant's reason was a pretext: (1) both plaintiffs were consistently good performers; (2) younger engineers with the same or lower performance evaluations were interviewed; (3) Mr. Grabb's performance evaluation was misstated; and (4) Mr. Tang's latest performance evaluation was removed from his personnel file.[5] These reasons, however, are not direct evidence of age discrimination in Bendix's decision on hiring nor do they singly or collectively, give rise to a reasonable inference that Bendix's stated reason for hiring the individuals they hired was merely a pretext for age discrimination against plaintiffs. Any such inference would be pure speculation. Other evidence pointed to by plaintiffs in support of their discriminatory hiring claim included the subsequent transfer of 2 employees back to ACSG, Bendix's purported violation of its policy with respect to requiring consideration of length of service when all other factors are equal, the statements by EC personnel that less experienced engineers are generally preferred because the learning curve of experienced and less experienced engineers in EC was about the same, the failure of plaintiffs to be hired into 30 to 50 new positions that have become available at ACSG since the September 1980 rif and the "mature work force problem" at Bendix. Although these facts are numerous, they do not give rise to an inference that age was a determining factor in Bendix's failure to hire them after the rif. First, the fact that 2 employees originally separated from ACSG were transferred back to ACSG from 8 months to 2 years later is certainly not probative of discriminatory intent or motive by other Bendix divisions in their earlier hiring decision. Second, the evidence reveals that the qualifications of those hired as compared to the plaintiffs were not equal so this assertion has no basis in fact. Third, the statements by EC related to qualifications not age. Fourth, there is no evidence in this record with respect to these 30 to 50 new positions at ACSG and furthermore these positions

---

**5.** At oral argument, plaintiffs counsel argued that the plaintiffs' resumes were not sent out to other Bendix divisions and that Bendix's stated reason on hiring was therefore not a business decision, thereby showing pretext. Counsel also argued that a jury could reasonably conclude that the resumes of those riffed engineers over the age of 40 were not sent out thus giving rise to a reasonable inference that Bendix had a discriminatory motive. The record reveals, however, that the resumes of plaintiffs were sent to outside concerns as well as other divisions of Bendix so this assertion has no basis in fact in this case. The plaintiffs also challenged the credibility of the statistical evidence complied by defendant's expert because of alleged errors contained in his report. The record in this case contains the underlying data upon which the statistics of both experts were based and this court has therefore been able to determine the correct numbers based on its own calculations and in accordance with the issues involved.

were never made a basis of an EEOC charge. *Cf. Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir.1984).[6] Finally, the "mature work force problem" lends no more support to plaintiffs' failure to hire claim than it did to their discriminatory discharge claim.

The plaintiffs have failed to produce any evidence that Bendix's stated reasons for its hiring decision has no basis in fact. They argue that they were qualified and that the engineers that were hired were not superior only younger. Bendix's stated reason, however, is that it hired the individuals whose qualifications best met the positions available and plaintiffs have not produced any evidence that their qualifications better met any of the available positions than those of the individuals who were hired. In fact as noted earlier, the plaintiffs did not even possess some of the characteristics or credentials required for some of the positions. Thus, the mere fact that younger engineers were hired and plaintiffs were not does not give rise to a reasonable inference that age was a determining factor in Bendix's hiring decisions.

### III.

Although summary judgment in a discrimination case is often inappropriate because issues of motive and intent are involved, when the evidence viewed in the light most favorable to the plaintiff fails to demonstrate a genuine issue of material fact as to pretext, summary judgment must be granted. Or, stated another way, when a case has no indications of motive and intent to put on a scales for weighing by a fact finder, summary judgment is appropriate. *Matthews, supra* at 1219; *Kephart, supra* at 1218; *Huhn, supra* at 242; *see Stumph v. Thomas & Skinner, Inc.*, 770 F.2d at 96. A plaintiff may not be allowed to proceed with a case on a mere hope that a trial would produce evidence that he or she has been unable to garner at the summary judgment stage. *Parker, supra* at 980.

There has been extensive pretrial discovery in this case including the depositions of all principal people involved in the employment decisions at issue in this case. The rif occurred because of adverse business conditions and those responsible for the employment decisions at ACSG explained the procedure followed as well as the choices they made by relative qualifications of the individual employees of ACSG. Likewise, the individuals involved in the hiring decisions at the other Bendix divisions also made their decisions based on the relative qualifications of the applicants. As stated by the Seventh Circuit Court of Appeals in *Parker v. Federal National Mortgage Ass'n*, 741 F.2d 975 (7th Cir. 1984):

> Decisions such as these will always involve a number of subjective factors, and disappointed candidates cannot expect a federal judge to intervene simply in the hope that he or she will evaluate the factors differently. The ADEA only requires the intervention of the federal judiciary when age is a determining factor in the decision.

*Id.* at 981. The ADEA was not intended to be a vehicle for judicial review of business decisions and a plaintiff cannot raise a material issue of fact on qualifications by merely challenging the judgment of the decision makers and the court is in no position to second guess an employer. *Kephart, supra* at 1223; *Huhn, supra* at 244. Thus, the question before a court in an age discrimination case is not whether the company's methods were sound or whether the discharge or failure to hire plaintiffs was an error of judgment. Rather, the question is whether the employer discriminated against the plaintiffs because of their age. In this case the plaintiffs have simply failed to show that "but for" their age they would not have been discharged and "but for" their age, they would have been hired by the other Bendix divisions. Accordingly, defendant's motion for summary judgment is hereby GRANT-

---

**6.** The plaintiffs have not alleged nor is there any basis in the record for a discriminatory pattern and practice claim or a continuing violation claim. *See Herman, supra.*

**1252**

ED. Costs assessed against the plaintiffs. SO ORDERED.